Filed 1/10/23 P. v. Johnson CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E077381 |
| v. | (Super.Ct.No. RIF1904942) |
| ALLYSON MORLEY JOHNSON, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Bernard Schwartz, Judge. Affirmed with directions.

Stephanie M. Adraktas, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Daniel Rogers and Amanda L. Lloyd, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant Allyson Morley Johnson sought psychiatric treatment from John A.,[1] a licensed psychiatrist. They entered into a sexual relationship and had a child, J.R. (a girl, born July 2013; hereafter Minor). John and defendant became embroiled in a custody dispute. Defendant took Minor on two separate occasions for a period of at least six months, not allowing John any contact with Minor. John, with the help of the Riverside County District Attorney's Office Child Abduction Unit (CAU), was able to find Minor on both occasions and she was returned to John. Defendant was convicted of two counts of kidnapping, child abduction and child custody deprivation.

Defendant claims on appeal that (1) insufficient evidence was presented to support one of her convictions of kidnapping and the child custody deprivation conviction; (2) insufficient evidence was presented to support her conviction of child abduction as she had a right to custody of Minor; (3) the trial court erred when it failed to instruct the jury on a good faith notification defense for the child abduction and child custody deprivation counts; (4) the trial court erred and violated defendant's federal Constitutional due process rights when it excluded evidence that John was controlling and that he violated the American Medical Association (AMA) ethical standards, and a criminal statute, when he engaged in sexual relations with her because it would have supported defendant's defense and impeached John's credibility; (5) the probation condition prohibiting all contact between defendant and Minor during her five-year probation term must be

---

[1] We refer to some witnesses by their first names for clarity due to shared last names and/or to preserve their anonymity (Cal. Rules of Court, rule 8.90(b)). No disrespect is intended.

stricken or modified; and (6) the matter should be remanded in order for the trial court to determine whether she should have been granted mental health diversion at sentencing under Penal Code section 1001.36.[2]

## I.    PROCEDURAL HISTORY

A second amended information was filed by the Riverside County District Attorney's Office on April 15, 2021, charging defendant with kidnapping on or about July 29, 2019 (§ 207; count 1); child abduction on or about July 29, 2019 (§ 278; count 2); kidnapping on or about March 27, 2018 (§ 207, subd. (a); count 3); and in count 4 with child custody deprivation on or about March 27, 2018 (§ 278.5). It was further alleged as to counts 1 and 3, that Minor was under the age of 14 years at the time of the kidnapping within the meaning of section 667.85. Defendant was found guilty of all counts and the special allegation.

Defendant was sentenced to five years on count 1 with a consecutive five-year sentence on the section 667.85 enhancement for a total of 10 years on count 1. In addition, defendant was sentenced to a consecutive sentence of one year and eight months on count 3. The trial court ordered the sentence suspended, and ordered formal probation for a period of five years. One of the conditions of defendant's probation was she was not to have any direct or indirect contact with Minor.

---

[2]  All further statutory references are to the Penal Code unless otherwise indicated.

## II.     FACTUAL HISTORY

### A.     PEOPLE'S CASE-IN-CHIEF

#### 1.     *JOHN AND DEFENDANT ENGAGE IN SEXUAL RELATIONSHIP AND DEFENDANT GIVES BIRTH TO MINOR*

John was a psychiatrist and had his own practice in Palm Desert. In October 2006, defendant came to his office to seek psychiatric treatment. Defendant had 14 visits with defendant and the doctor/patient relationship ended in September 2007. In July 2007, defendant referred her three children to John. They were all having emotional issues. He only treated them for about two weeks.

Defendant and John stayed in touch on occasion after the doctor/patient relationship ended. Defendant helped John get two puppies after his dog died and she would periodically check in with him about the dogs. Defendant was married but got divorced in 2007. John was in a relationship with another woman from 2007 to 2010. John received a letter from defendant in 2007 in which she told him that he could ask her out on a date. She acknowledged in the letter that he was no longer treating her as a patient.

In 2011, John began a dating relationship with defendant. They had Minor in July 2013. John was excited when Minor was born because he had no other children. Defendant and Minor moved in with John. In 2013, defendant had a dental procedure and was in pain. John wrote her a prescription for Neurontin to help with the pain. He was not treating her as a patient at the time. In 2015, defendant's ex-husband passed

away. The relationship between defendant and John became more volatile after the ex-husband's death.

John and defendant broke up on February 19, 2015, when defendant moved out of his house. On February 26, 2016, John was served by defendant with a temporary domestic violence restraining order. He denied there was any domestic violence between him and defendant.

On March 18, 2016, the family court awarded joint legal custody to John and defendant for Minor; defendant was granted physical custody. John was granted visitation one day each week. The family court found that the evidence did not support the issuance of a permanent domestic violence restraining order.[3] At another hearing on July 18, 2016, John and defendant stipulated that John was the father of Minor. John never had time to add his name to the birth certificate.

On June 25, 2017, John was scheduled to meet defendant to have his court-ordered visitation with Minor. Defendant was living in Anza. Defendant did not meet him and did not answer her phone. He went to Anza for the scheduled visitation with Minor two more times—on July 2 and July 9, 2017—and defendant did not meet him. He filed a request for a hearing in the family court in August 2017 after not seeing Minor since June 13, 2017. In August 2017 he appeared at a hearing and defendant was not present. At the hearing, the family court kept the joint legal custody, but awarded John physical

---

[3] The trial court took judicial notice of the minute orders from the family court case (case No. IND1600490) that were admitted as exhibits in this case. The exhibits were transferred to this court for our review.

5

custody of Minor. Visitation between Minor and defendant would be every Wednesday from 10:00 a.m. to 8:00 p.m. After the hearing, John served defendant by sending her an email and mailing it to the address she had provided to the family court, but received no response.

When defendant still had not contacted John by early January 2018, he filed an emergency order with the court. On January 22, 2018, at a hearing in the family court, John was present but defendant was not present. John informed the family law court that he had not seen Minor for over six months. The trial court ordered that the CAU find Minor.

2. *DEFENDANT AND MINOR FOUND IN IDYLLWILD*

Senior Investigator Sherry Eversole was employed by the CAU. She worked closely with the family court to ensure that child custody orders were followed and to facilitate the return of children to the person with right to custody. Investigator Eversole was assigned to locate Minor. She was given the minute order from court proceedings dated January 22, 2018, which ordered the CAU to locate Minor and serve defendant with the next court date. The next court date was set for February 22, 2018.

Investigator Eversole interviewed John. He told her that he thought defendant was staying in the Idyllwild area. Investigator Eversole went to Idyllwild on or about February 8, 2018. As she was driving in town, she saw defendant and Minor walking down the street. Investigator Eversole approached defendant and identified herself. She told defendant she had to serve her with court papers. Defendant yelled at Investigator Eversole that she was not going to take her daughter and that John was abusive. She

6

would never let John see Minor again. Investigator Eversole informed her that she had to appear in court and handed her the documents, including the minute order from the hearing on January 22, 2018.

Based on the minute order from the hearing on February 22, 2018, defendant failed to appear. John was present in court. The family law court ordered that the CAU find Minor and return her to John. John was granted sole legal and physical custody of Minor at the hearing. Defendant was not entitled to visitation.

Investigator Eversole went back to Idyllwild to find defendant and Minor. She obtained a protective custody warrant from the court so that she could take Minor into custody. Investigator Eversole discovered that Minor and defendant may be living with a man named Arn Hancock who was a volunteer firefighter for the town of Idyllwild. Investigator Eversole and another investigator could not access Hancock's home due to security fences at the location and went to the fire station. They spoke with the fire chief who called Hancock into the station. Hancock stated he was aware of the whereabouts of defendant and Minor but did not want to disclose the address. He agreed to bring them to the fire station. Approximately one hour later, Hancock brought defendant and Minor to the fire station.

When defendant saw Investigator Eversole, she screamed at her that she would do whatever it takes to keep her daughter. She would not let Minor out of her sight. Investigator Eversole told defendant she had to take Minor back to John. She reviewed all of the court documents with defendant. Defendant yelled and screamed that she was going to get Minor back and then left. Investigator Eversole took Minor to be reunited

7

with John on March 27, 2018. Minor was four years old. Minor was confused at first but knew she was back home.

### 3. *EVENTS BETWEEN 2018 AND 2019*

On May 3, 2018, defendant and John returned to family court. Defendant was advised that John was granted sole legal and physical custody. Defendant was granted supervised visitation with Minor. There were no further custody changes during 2018. In January 2019, John agreed with defendant that supervised visits should be terminated. On July 12, 2019, defendant and John appeared in court. Defendant was granted visitation each week from Sunday at 9:30 a.m. to 8:30 p.m. on Monday. The family court awarded joint legal custody to defendant and John, and physical custody to John.

In July 2019, John had a birthday party for Minor. They were at a neighbor's house having cake and pizza. Defendant arrived even though her visitation was not for three days. John did not let her in the house and did not speak to her. Defendant had a phone call with Minor that night but defendant hung up on Minor. Defendant called back about 25 minutes later and spoke with Minor for five minutes. Two hours later, the police arrived at John's house. They spoke with John and Minor and then left. The next morning, someone parked their car blocking John's driveway. The police were called to remove the car.

Sheri Postma was the manager of Indian Wells R.V. Park. In April 2019, defendant came to the park and signed a one-year lease for a R.V. space. In June 2019, defendant was living in the park and would have a child visit her on the weekends. In late July 2019, defendant told Postma that she was leaving and taking her daughter to her

8

son's house. Defendant was concerned that John was planning to take the child to Boston. Defendant disappeared. Someone came about one month after she left and took the trailer she had been living in.

On July 29, 2019, John took Minor to the scheduled visit with defendant. Defendant never returned Minor to John.

4.    *WASHINGTON CASE*

On August 5, 2019, Investigator Eversole was again contacted by John complaining that defendant was not complying with the court orders in regards to Minor. On August 7, 2019, a court hearing was held. John and counsel for defendant were present but not defendant. It was ordered that the CAU find Minor and return her to John's custody. John had been awarded sole legal and physical custody.

John did not hear from defendant or Minor from August 2019 through December 2019. It took four months for Investigator Eversole to discover that defendant may be living with defendant's son in Washington.

Investigator Eversole contacted authorities in the town of Everett, Washington. On January 18, 2020, the local authorities were able to apprehend defendant and Minor at a Walmart in Everett, Washington. When defendant was apprehended, she told the officers that she had been abused by John and that Minor had also disclosed she had been abused. She took Minor away from John because he had threatened to move Minor to Boston. Defendant also stated she had a conversation with the "Holy Spirit" and decided it was time for her to take Minor away from John. Defendant had been staying at a

9

women's shelter. Minor and defendant were separated at the police station. Minor seemed more relaxed and playful outside defendant's presence.

Investigator Eversole and Minor had a video call with John while Minor was at the police station. Minor appeared to be happy. John went to Seattle and picked up Minor who had been staying with his niece while he traveled to Washington. John had to slowly build back his relationship with Minor. Minor was happy once they were back in John's home.

During Investigator Eversole's involvement in the case, she never had concerns about Minor being with John. She found no information during her investigation of the case that he was a danger to Minor. She had no reservations about leaving Minor with John despite defendant's claims of abuse. During the video call while Minor was in Washington and was going to go home with John's niece, Minor did say that she was afraid of John. Investigator Eversole spoke with Minor once she was back in John's home after returning from Washington and Minor was upset that she had been separated from defendant.

Child protective services was never involved in the case. John denied that he had ever abused Minor. He insisted he and defendant did not have sex until 2011 after their doctor/patient relationship terminated. During cross-examination of John, he was asked if as a licensed psychiatrist it was ethical to have a relationship with a former patient. He believed it was ethical if the relationship began after treatment. He agreed he had a duty as a psychiatrist to not take advantage of a patient and to ensure there was no impropriety in the psychiatrist/patient relationship. He agreed that sexual behavior with patients was

10

unethical. He did not believe that his relationship with defendant, which occurred four years after he treated her, was unethical. Defendant's counsel asked, "Even though the rule on therapeutic boundary keeping indicates that relationships, sexual relationships, with former patients is unethical, you disagree with that?" John responded, "I disagree with that." His relationship with defendant was not a violation of ethical rules in his opinion.

## B.    DEFENSE

Roland Deleon was a professional monitor employed by the State of California to help with family court cases. He was assigned by the family court to monitor visits between defendant and Minor. He supervised visits between Minor and defendant for two years. Minor and defendant were bonded and it was clear they loved each other. Oftentimes Minor did not want visits to end. He recommended to the family court that defendant have unsupervised visitation.

Deleon had only seen John with Minor on a few occasions but she seemed to enjoy being with him. John had asked Deleon to keep defendant away from him while they exchanged custody. He had seen Minor with a cut on her forehead in 2018. John explained that Minor had fallen and hit her head on a sprinkler.[4] Minor never told Deleon that she was afraid of John. Minor never reported any abuse by either parent.

Colbi Gardner was defendant's 25-year-old daughter. She had been seen by John one time but did not need psychiatric treatment. Her father and siblings saw John

---

[4] Defendant accused John of pushing Minor and her falling on a sprinkler. Minor did not tell Deleon John had pushed her.

multiple times. She was aware that defendant became romantically involved with John but she did not know the exact date. She surmised it was still while she was being treated by John.

Gardner was present with defendant when Minor was born. John was not present for the birth. Gardner believed that John did not want to be involved with Minor. John allowed Gardner to call Minor but her other siblings were not allowed to. John told her that he would monitor the phone calls and that she was not to talk about defendant or her siblings. Minor never told Gardner that John abused her.

Ashlyn was defendant's 24-year-old daughter. She sought treatment from John on several occasions. She started treatment in 2007 when she was nine years old. She received treatment until she was approximately 13 or 14 years old. Ashlyn believed that defendant and John started their relationship while she was still his patient. She observed them together before Minor was born. John was lying that the relationship did not begin until 2011.

Ashlyn stated that John was not a part of Minor's life until defendant threatened to hold him accountable for having sexual relations with her. Ashlyn observed when John and defendant were living together that he would get close to defendant and make her back up. She never saw John touch defendant. She had seen bruises on Minor but could not recall where they were on her body. Minor said the bruises came from falling off a swing. Ashlyn did not think they looked like that was the cause. Defendant told her when she was 10 or 11 years old that she was having an affair with John.

12

Defendant testified on her own behalf. Defendant stated that her sexual relationship with John began in November 2006 after she had three visits with him. In her sessions with John, they discussed her personal life. John told her that he was attracted to her, and she felt the same way about him. She began having late-night appointments with him and they would engage in sex acts. They would engage in these sex acts in his office, in a hotel, and in his car. She was attracted to him and he paid attention to her.

John would threaten her not to tell anyone about their relationship so they kept it a secret. She felt that John had control over her. He had the power in the relationship because he was her psychiatrist. He forced her to write the letter stating that their patient/psychiatrist relationship was over and that he could ask her out. She went along with whatever John told her to do.

John prescribed her Neurontin in 2006 as a mood stabilizer. When he prescribed it for her in 2013 he had actually been having her take it for years. John started becoming abusive to her prior to Minor's birth. He would have her at his house for several days to engage in sex and then make her leave when he got tired of her. John would shove and push her. He would grab her arms. He never punched her. She claimed he made her sign a letter that he was not Minor's father but she lost it. From 2013 to 2016, John did not have any involvement in Minor's life.

After a visit with John, Minor had a "crack" on her head that required liquid stitches. Minor told defendant that John had pushed her and she fell on a sprinkler. Minor came back from a visit with John with scratches on her stomach. She told

13

defendant that John had scratched her on the stomach. Defendant also claimed Minor returned one time from a visit and was red in her vaginal area. She became concerned that John was inappropriately touching Minor. She went to child protective services in Indio but they would not take a report.

Defendant obtained a temporary restraining order against John. When she went to court for the permanent restraining order she felt that her side of the story was not being heard by the judge. John knew all of the police officers in Indio so she felt when she tried to call them to get help that they would not assist her. The family court ordered that John, defendant and Minor all receive psychological evaluations. John and defendant submitted in writing to the family court that they agreed no examinations were necessary. John had convinced her to not have the evaluations by agreeing to continued visitation. He threatened her that she would not see Minor if she insisted on the evaluations.

In January 2018, defendant stopped meeting John for his visitation because he threatened to take Minor away. She filed a medical malpractice suit against John for having sexual relations with her while she was a patient. Several days later she was served with the notice of the hearing that John was seeking full custody of Minor. She did not let John see Minor because she felt that she had to protect Minor from harm.

In 2019, Minor told defendant that she and John were packed and were moving to another state. Defendant observed redness on Minor's vagina and believed that John was sexually abusing Minor. Defendant felt she had no choice in order to protect Minor other than taking her away from John. She took Minor to Washington on July 29, 2019. Minor and defendant stayed at a battered women's shelter in Washington. The shelter helped

14

her obtain a temporary restraining order against John. It was sent to the Riverside County Sheriff's Department to be served on John but was never served.

Defendant insisted that Minor told one of the officers who detained them in Washington that Minor had been abused by John. Child protective services were not called and defendant surmised that John was able to stop it. Defendant insisted Minor was sad that she had to return to John's care. Defendant felt that she did everything she could legally without results before she took Minor away from John.

Defendant insisted that John controlled the judges when they appeared in the family court. She insisted she had photographs of Minor's injuries but they were in Washington and she did not have them for trial.

Defendant insisted she called the Indio Police Department on July 26, 2017, and tried to make a report that John was taking Minor to Maine. She insisted she sent the photographs of injuries to Minor from 2016 and 2017 to child protective services but they did nothing. They advised her that John had called and said that defendant was crazy. She insisted she filed documents with the family law court in early 2018 complaining about John abusing Minor but the judge did not read the documents.

Defendant videotaped Minor telling defendant that John abused her but that was on an iPad she had in Washington. Even though she saw the redness on Minor's vagina on July 28, 2019, and Minor told her that John was abusing her, she did not call the police because she felt they would do nothing for her.

C.    REBUTTAL

Indio Police Officer Cory Kramer received a call of domestic violence on January 27, 2016, from defendant. Defendant did not claim to be injured but stated she wanted documentation for her attorney. She reported that John was controlling her movements and had bumped her chest. Officer Kramer referred her to domestic violence resources. Defendant also reported that she and John had been in a relationship for 10 years and had a two-year-old daughter. If a person reported sexual abuse to the Indio Police Department, it would be assigned to a detective who would investigate the allegation.

John was recalled. He told Deleon on July 1, 2018, that he was taking Minor on a trip to Boston. He gave all of the information to Deleon. When he and Minor arrived at the airport on July 25, 2018, they were stopped by Palm Springs police officers. He had to show the officers his flight documentation and return date. The officers let him take the trip. He never planned to move to Boston with Minor in July 2019.

On April 22, 2020, a county social worker came to speak with John at his home. Minor was present and they were asked questions by the social worker, who also inspected the home. She spoke with Minor privately for 20 minutes and then left the home. Minor was never taken from John. There was no follow up by child protective services.

He disagreed with some of the ethical rules of the APA. He felt that as a former patient, he could pursue the relationship with defendant. He was aware that she suffered emotional distress prior to their relationship with her ex-husband but still pursued the

16

relationship. John was asked if he abused his authority by having a sexual relationship with defendant, and he responded that his conscience was clear.

**DISCUSSION**

A.    <u>INSUFFICIENT EVIDENCE</u>

Defendant contends the evidence was insufficient to support her conviction of (1) kidnapping in count 3; (2) criminal abduction in count 2; and (3) child custody deprivation in count 4. Counts 3 and 4 pertained to the convictions where Minor was taken by defendant to Idyllwild. Count 2 was the time Minor was taken to Washington.

1.    *STANDARD OF REVIEW*

" 'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] . . . . We do not reweigh evidence or reevaluate a witness's credibility.' [Citations.] 'Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' " (*People v. Brown* (2014) 59 Cal.4th 86, 105-106.)

## 2. *KIDNAPPING—COUNT 3*

Defendant argues there was no substantial, credible evidence presented that she kidnapped Minor on March 27, 2018. She insists on that day she took Minor to the Idyllwild fire station and gave up custody of Minor to Investigator Eversole. She contends that she was not served with the order entered by the trial court on February 22, 2018, granting sole legal and physical custody to John, until March 27, 2018, when she turned over custody of Minor. She could not be convicted of kidnapping Minor on that day or any day prior to being served with the custody change.

"Generally, to prove the crime of kidnapping, the prosecution must prove three elements: (1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance." (*People v. Jones* (2003) 108 Cal.App.4th 455, 462, citing § 207, subd. (a), fn. omitted.) "[T]he general rule is that a parent entitled to custody cannot be liable for kidnapping his or her own child." (*People v. Senior* (1992) 3 Cal.App.4th 765, 781.) However, "[A] noncustodial parent may be convicted of kidnapping if the intent and purpose of the movement is to illegally separate the child from the parent who has lawful custody." (*Jones,* at p. 466.)

"[T]he amount of force required to kidnap an unresisting infant or child is simply the amount of physical force required to take and carry the child away a substantial distance for an illegal purpose or with an illegal intent." (*People v. Dalerio* (2006) 144 Cal.App.4th 775, 781, citing *Michele D.* (2002) 29 Cal.4th 600.)

18

Based on the evidence before the jury, it could reasonably conclude that defendant kidnapped Minor. According to the family court proceedings, on March 18, 2016, the family court awarded joint legal custody of Minor to John and defendant. Defendant was granted physical custody but John was granted visitation one day each week. Defendant was present at this hearing. At another hearing on July 18, 2016, John and defendant stipulated that John was the father of Minor. On August 28, 2017, after defendant had failed to bring Minor to the court-ordered visitation with John on several occasions, John went to court and was awarded physical custody of Minor. Defendant was served both with the notice of the August 28, 2017, hearing and the result of the hearing. John emailed defendant about the change in custody. The jury could reasonably conclude the defendant received this notice of change in custody but chose to keep Minor from John, who was entitled to custody, an illegal purpose.

Further, at the hearing on February 22, 2018, which defendant was personally served with the notice to appear at, the family court awarded John sole legal and physical custody of Minor. As such, as of the date, defendant no longer had any right to custody of Minor.

Defendant insists that she was wrongfully convicted of kidnapping based on the prosecutor's argument that she committed the offense between February 22, 2018, and March 27, 2018, because the information charged her with committing the offense on March 27, 2018. The allegation in the second amended information was that defendant kidnapped Minor "on or about" March 27, 2018. " 'The law is clear that, when it is charged that an offense was committed "on or about" a named date, the exact date need

19

not be proved unless the time "is a material ingredient in the offense" [citation], and the evidence is not insufficient merely because it shows that the offense was committed on another date.'" (*People v. Garcia* (2016) 247 Cal.App.4th 1013, 1022; see also § 955.) The jury was not instructed that they had to find the kidnapping occurred on a specific date, and the prosecutor argued that the kidnapping occurred between February 22, 2018, and March 27, 2018. The date in the second amended information was not "material" to the finding of kidnapping in count 1. (§ 955.)

Further, defendant claims she was not properly convicted of kidnapping because she was not personally served with notice that she lost legal and physical custody of Minor until March 27, 2018. Defendant relies on *People v. Johnson* (1984) 151 Cal.App.3d 1021, 1026. In *Johnson,* the father was charged with child abduction but the charges were dismissed based on the fact he had never been advised of a court order that awarded the mother custody. No previous orders regarding the custody of the children had been made by any court. (*Id.* at pp. 1026-1029} Here, defendant claimed to not be aware of the court's March 27, 2018, order, but she had been served with prior orders that granted John physical custody of Minor. The jury could reasonably reject that she had no notice she had no right to physical custody of Minor based on the prior orders.

Further, defendant was not ignorant of the court proceedings and purposefully absented herself from the proceedings to avoid Minor being taken from her. Defendant was served in person with notice of the hearing on February 22, 2018. When defendant was served with the minute order to appear in court on February 22, 2018, she screamed at Investigator Eversole that John would not get Minor back. She insisted that John

would never see Minor again. At the hearing that defendant chose to ignore, John was granted sole physical and legal custody. Defendant was aware that Minor's custody was the subject of the February 22, 2018, hearing but she chose not to appear or return Minor to John for his court-ordered visitation. Defendant cannot claim ignorance as she intentionally avoided the hearing.

The jury could reasonably conclude that defendant's intent and purpose in keeping Minor in Idyllwild was to keep her away from John. Such intent and purpose was illegal because she lost physical custody of Minor in August 2017, and physical and legal custody at the February 22, 2018, hearing. Defendant's intent and purpose was clear that she wanted to separate Minor from John and she had no intention of returning Minor, whatever the court ordered as to custody on February 22, 2018. She could not claim ignorance of such orders as a defense. Sufficient evidence supported the kidnapping charge in count 3.

### 3.    *CHILD CUSTODY DEPRIVATION*

Defendant further contends, similar to her claim as to the kidnapping charge in count 3, that she could not be convicted of violating section 278.5 in count 4 as she had right of custody of Minor on March 27, 2018. She insists that she was not served with the change in custody orders until March 27, 2018, and could not have violated section 278.5 prior to that date.

On March 18, 2016, the family court awarded joint legal custody to John and defendant for Minor. Defendant was granted physical custody but John was granted

visitation one day each week. Defendant was present at this hearing. This order was in effect when defendant took Minor to Idyllwild.

Section 278.5, subdivision (a) provides, "Every person who takes, entices away, keeps, withholds, or conceals a child and maliciously deprives a lawful custodian of a right to custody, *or a person of a right to visitation*, shall be punished by imprisonment in a county jail not exceeding one year, a fine not exceeding one thousand dollars ($1,000), or both that fine and imprisonment, or by imprisonment pursuant to subdivision (h) of Section 1170 for 16 months, or two or three years, a fine not exceeding ten thousand dollars ($10,000), or both that fine and imprisonment." (§ 278.5, subd. (a), italics added.) "The statute merely requires that the defendant deprive 'a person of a right to visitation,' [citation], and 'visitation' simply means 'the time for access to the child allotted to any person by court order.' " (*People v. DeJongh* (2015) 237 Cal.App.4th 1124, 1129.)

There was no dispute that John had visitation rights at the time that defendant took Minor to Idyllwild and defendant did not let him see her, a clear violation of section 278.5. Defendant complains that she did not violate section 278.5 until she was actually served with an order terminating her right to custody of Minor on March 27, 2018. Such notice of termination of her legal and physical custody was not required in order for her to be found guilty of section 278.5. Once she deprived John of his court-ordered visitation, she violated section 278.5.

### 4. *CHILD ABDUCTION*

Defendant further contends insufficient evidence was presented to support her conviction of child abduction in count 2, when she took Minor to Washington. She

claims because she was entitled at the time to have Minor from Sunday at 9:30 a.m. until 8:30 p.m. on Monday each week, the family court's order in fact resulted in de facto joint physical custody. Since she had a right to custody, she could not be found guilty of violating section 278 when she took Minor to Washington.

Section 278 makes it a crime for a person "not having a right to custody," to maliciously take, entice away, keep, withhold or conceal a child from his or her lawful custodian. The jury was instructed as to the elements of section 278 that defendant maliciously took a child from the child's lawful custodian; the child was under the age of 18; when the defendant acted, she did not have a right to custody of that child; and defendant intended to detain or conceal the child from the child's lawful custodian. "[T]he phrase 'right to custody' means the right to physical care, custody, and control of the child pursuant to a custody order." (*People v. Mehaisin* (2002) 101 Cal.App.4th 958, 963; § 277, subd. (e).) "Visitation" means time for access to the child allotted to any person by court order. (§ 277, subd. (h).)

Defendant took Minor to Washington in June 2019. At that time, the most recent order on July 12, 2019, granted defendant unsupervised visitation each week with Minor from Sunday at 9:30 a.m. to 8:30 p.m. on Monday. John and defendant had joint legal custody and John had physical custody of Minor. John had the right to custody of Minor.

Defendant relies on *Sy v. Superior Court* (2018) 29 Cal.App.5th 324, for the proposition that, since at the time she took Minor to Washington she had visitation (which she calls non-custodial days) from 9:30 a.m. on Sunday until 8:30 p.m. on Monday each week, she had "de facto" joint physical custody of Minor. In *Sy*, the

23

mother was given physical custody for four days and the father was given "visitation" for three days. The court determined that this amounted to de facto joint physical custody as they essentially shared custody time. (*Id.* at p. 332.)

In *Sy*, the court relied on *Celia S. v. Hugo H.* (2016) 3 Cal.App.5th 655, 663, which found that a 50/50 split of time between parents was de facto joint physical custody despite the court stating that the mother would have sole physical and legal custody, and John's time was visitation. In attempting to define when de facto joint physical custody was applicable, it noted, " 'Where children 'shuttle [] back and forth between two parents' [citation] so that they spend nearly equal times with each parent, or where the parent with whom the child does not reside sees the child four or five times a week, this amounts to joint physical custody.' " (*Id.* at pp. 663-664.) "In contrast, where 'a John has a child only 20 percent of the time, on alternate weekends and one or two nights a week, this amounts to sole physical custody for the mother with "liberal visitation rights" for the father.' " (*Id.* at p. 664.)

Here, Minor stayed only one night with defendant each week. The circumstances are not close to those in *Sy* and *Celia*. John had been granted sole physical custody of Minor when defendant took her to Washington and defendant refused to allow John to see her. Such actions violated section 278 as John possessed the right to custody of Minor.

B.    INSTRUCTIONAL ERROR

Defendant contends the trial court had a sua sponte duty to instruct the jury with CALCRIM No. 1252 regarding the good faith notification defense to the child abduction charge in count 2 and deprivation of child custody charge in count 4.

CALCRIM No. 1252 provides a defense to child custody deprivation[5] as follows: "The defendant did not maliciously deprive a (lawful custodian of a right to custody/ [or] person of a right to visitation) if the defendant: [¶] 1. Had a right to custody of the child when (he/she) abducted the child; [¶] 2. Had a good faith and reasonable belief when abducting the child that the child would suffer immediate bodily injury or emotional harm if left with the other person; [¶] 3. Made a report to the district attorney's office in the county where the child lived within a reasonable time after the abduction; [¶] 4. Began a custody proceeding in an appropriate court within a reasonable time after the abduction; [¶] AND [¶] 5. Informed the district attorney's office of any change of address or telephone number for (himself/herself) and the child.  [¶]  To *abduct* means to take, entice away, keep, withhold, or conceal."  It further provides, "The People have the burden of proving beyond a reasonable doubt that the defendant maliciously deprived a (lawful custodian of a right to custody/ [or] person of a right to visitation).  If the People have not met this burden, you must find the defendant not guilty of _____ <insert crime charged>."

---

[5] It is not entirely clear that this defense applies to the charge of violating section 278 but we will presume that it applies for purposes of this appeal.

25

We need not determine if the trial court should have instructed the jury with CALCRIM No. 1252 because any error in failing to instruct the jury was harmless. "An error arising from the failure to instruct on a defense to a charge is most commonly analyzed under the test articulated in *People v. Watson* (1956) 46 Cal.2d 818. . . . [Citation.] The judgment is reversed when it appears from an examination of the record that there is a reasonable probability the defendant would have obtained a more favorable outcome had the error not occurred." (*People v. Sojka* (2011) 196 Cal.App.4th 733, 738.)

Defendant contends the proper standard for review is the beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18. "Instructional error of federal constitutional proportions is generally subject to harmless error analysis under *Chapman*." (*People v. Kobrin* (1995) 11 Cal.4th 416, 428.) "The California Supreme Court has not yet determined the test of prejudice for failure to instruct on an affirmative defense." (*People v. Watt* (2014) 229 Cal.App.4th 1215, 1219.) Even if we apply the *Chapman* test, since the issue was resolved adversely against defendant under other properly given instructions, reversal is not required.

"In determining whether instructional error was harmless, relevant inquiries are whether 'the factual question posed by the omitted instruction necessarily was resolved adversely to the defendant under other, properly given instructions.' " (*People v. Bell* (2009) 179 Cal.App.4th 428, 439.)

The jury was instructed with CALCRIM No. 1225 on the defense of imminent harm for kidnapping. The jury was instructed, "The defendant is not guilty of kidnapping if she took or detained a child under the age of 14 years to protect that child from danger

26

or eminent harm. An eminent harm is an immediate or present threat of harm. Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed that the child was in eminent danger. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant did not act to protect the child from the danger of eminent harm."

The kidnapping in count 1 and the child abduction on count 2 were based on the same time period and involved the same parties. The same is true for the kidnapping in count 3 and the child custody deprivation charge in count 4. The jury found beyond a reasonable doubt that defendant did not take Minor "to protect [Minor] from the danger of imminent harm." (CALCRIM No. 1225.) As such, even had the jury been instructed with CALCRIM No. 1252 it necessarily would have rejected the defense as it required that the jury find that defendant kept Minor from John because she "[h]ad a good faith and reasonable belief when abducting the child that the child would suffer immediate bodily injury or emotional harm if left with the other person." (CALCRIM No. 1252.) Any conceivable error in failing to sua sponte instruct the jury with the good faith defense was harmless under any standard of review.

## C. EXCLUSION OF EVIDENCE

Defendant contends the trial court erred when it excluded evidence intended to impeach John's credibility. First, she complains the trial court improperly excluded testimony from Ashlyn, that John would manipulate defendant by threatening to take Minor away from her, and controlled defendant's life. Further, the trial court should have allowed evidence that John having sexual relations with defendant violated not only the

27

APA's ethical standards, but also the American Medical Association (AMA) ethical standards regarding exploiting current or prior patients, and that John could be criminally responsible for violating California Business and Professions Code section 729, which criminalized exploitation of current or former patients. This evidence would have impeached John's credibility and supported her defense. Such exclusion violated her federal Constitutional due process rights.

### 1. ADMISSION OF EVIDENCE

Only relevant evidence is admissible at trial. (Evid. Code, § 350.) Relevance is defined as " ' having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' " (*People v. Jones* (2013) 57 Cal.4th 899, 947.) Evidence Code section 352 requires the exclusion of evidence only when its probative value is substantially outweighed by its prejudicial effect. "Evidence is substantially more prejudicial than probative [citation] [only] if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome.' " (*Jones,* at p. 948.) " 'The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair.' " (*Id.* at p. 949.)

"A trial court has 'considerable discretion' in determining the relevance of evidence. [Citation.] Similarly, the court has broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects." (*People v. Merriman* (2014) 60 Cal.4th 1, 74.) We review a trial court's ruling under Evidence

Code section 352 for an abuse of discretion.  We will not reverse a court's ruling on such matters unless it is shown ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Merriman*, at p. 74.)

### 2. *ASHLYN'S TESTIMONY*

During Ashlyn's direct testimony, defendant's counsel sought to ask her questions as to how John was controlling in his relationship with defendant.  An Evidence Code section 402 hearing was held outside the presence of the jury.  Ashlyn could not give any specific examples of witnessing threats by John in text messages or in person.  She insisted that John controlled defendant's life but did not provide a specific example. Defendant's counsel asked if she witnessed him making threats toward her during the relationship, she responded, "Yes and no.  Like, I mean, that's—I can't think of anything specific as far as threats.  Well, actually, there were times when he would message her threatening to take [a]way [Minor] and stuff because that really was the only thing important to her, so it was the only leverage, in my opinion, that he had against her that she cared about."  Defendant's counsel asked, "Did you see the messages and how did you know that they were from [John]."  Ashlyn cut off defendant's counsel and responded, "I mean, he has, like, one name—or his email, it was similar to my dad's email, but I've seen her phone and I was there.  She's my mom, you know, so I experienced it.  Like, I was there when it happened and while it was going on."  She further stated, "There—it's difficult to talk about because I'm under this oath, but, I mean, like, growing up I do remember when he—he was just very controlling of my

29

mom and he controlled, like, almost all parts of her life. Like, she didn't have any money and stuff, so that was something he held over her, and where to live, and controlled her in that way and—just very controlling of her life." She could not provide any specific examples.

The trial court ruled, "I just—I don't think there's anything specific at all. I mean, there's some generalities, most of which has nothing to do with the controlling issue. So I'm not going to allow any further inquiry in that regard. . . . It appears as though it either comes from hearsay or it's her surmising or opinions based on various different things that really don't have any pinpoint examples of controlling [in] nature or threatening in nature." Ashlyn offered emails that she had printed between John and defendant but the trial court noted these were already possessed by the parties and may come in through another witness.

The trial court did not abuse its discretion by refusing to allow Ashlyn to testify regarding vague allegations that John controlled defendant's life and threatened her. Ashlyn could provide no concrete examples of John's behavior and was evasive during the Evidence Code section 402 hearing. The trial court also reasonably concluded that any knowledge possessed by Ashlyn was from hearsay and was not relevant to the disputed issues.

Defendant contends the trial court erred because Ashlyn testified at the Evidence Code section 402 hearing that she saw text messages threatening to take Minor, and observed John threatening defendant not to disclose the nature of their sexual relationship, citing to reporter's transcript pages 385 to 388. We have set forth the

30

testimony, *ante*, and it does not provide the details as described by defendant. Ashlyn was vague in her offer of the testimony that she would give. The trial court did not abuse its discretion by finding the evidence was not admissible.

### 3. *EXCLUSION OF AMA ETHICAL STANDARDS AND CRIMINAL VIOLATION*

Defendant insists that further evidence was warranted to show that John violated the ethical rules of the AMA and that he was possibly criminally responsible for his actions pursuant to Business and Professions Code section 729.[6] She states this evidence was necessary to impeach John's credibility and demonstrate his motive to threaten and abuse defendant. Its exclusion violated her federal Constitutional rights to present a defense.

As set forth, *ante*, defendant's counsel asked John about the APA ethical rules during the People's case-in-chief. John was called in rebuttal. Defendant's counsel sought to cross-examine John with the AMA ethical rules and a California law regarding exploitation of current and former patients. Defendant's counsel contended it was

---

[6] Business and Professions Code section 729, subdivision (a) provides, "Any physician and surgeon, psychotherapist, alcohol and drug abuse counselor or any person holding himself or herself out to be a physician and surgeon, psychotherapist, or alcohol and drug abuse counselor, who engages in an act of sexual intercourse, sodomy, oral copulation, or sexual contact with a patient or client, or with a former patient or client when the relationship was terminated primarily for the purpose of engaging in those acts, unless the physician and surgeon, psychotherapist, or alcohol and drug abuse counselor has referred the patient or client to an independent and objective physician and surgeon, psychotherapist, or alcohol and drug abuse counselor recommended by a third-party physician and surgeon, psychotherapist, or alcohol and drug abuse counselor for treatment, is guilty of sexual exploitation by a physician and surgeon, psychotherapist, or alcohol and drug abuse counselor."

31

relevant to impeach John's credibility and the jury should be made aware of how unethical the conduct of John was in having sexual relations with a patient.

The prosecutor responded such evidence would be relevant if the case were in regard to John being prosecuted by the Medical Board of California. It was not what the charges in the case were about and it was also cumulative. The trial court believed John already stated in front of the jury that having a relationship with a current patient was unethical. Further, the ethical rules were only guidelines. It was not clear that being with a former patient would result in loss of license or criminal charges. Further, it was cumulative to already admitted evidence.

Defendant's counsel then argued that the AMA ethical rules and Business and Professions Code section 729 dealt with sexual exploitation with a current or former patient. He should be able to cross-examine John on these rules. The prosecutor argued it had already been established that John was a "creep."

Defendant's counsel indicated it was relevant for impeachment. John could face a term in county jail under a violation of Business and Professions Code section 729 even if defendant was a former patient when they had sexual relations. John had not previously been asked about the Business and Professions Code. The evidence was not cumulative because the AMA ethical rules and criminal statute were separate from the APA ethical rules.

The trial court researched Business and Professions Code section 729. The trial court noted that if John was going to be held criminally responsible, he would be entitled to counsel. The trial court read the section noting it required evidence that the

32

relationship was ended primarily for the purpose of engaging in sexual acts. The prosecutor referred to the letter sent by defendant that she was a former patient and that he could ask her out.

The trial court noted that potential criminal liability evidence was not cumulative. The trial court noted that defendant testified the relationship started while she was still a patient. John testified the relationship started after the doctor/patient relationship ended. There was no evidence that the doctor/patient relationship was terminated in order to start the sexual relationship.

The trial court felt that John had already been impeached that he did something he was not supposed to do whether legally, ethically or morally. The state of the evidence did not show he had committed a crime. Defendant's counsel argued he should be able to ask John since there were witnesses who testified the relationship occurred while she was a patient.

The trial court acknowledged the youngest daughter testified that the relationship started while defendant was still a patient and that defendant's counsel could argue it was unethical. There was sufficient evidence that a doctor should not have sexual relations with a former or current client. Defendant's counsel again stated there was a difference between unethical conduct and illegal conduct. The trial court stated, "But it would only be illegal if he stopped the relationship. Do you have evidence that he stopped the relationship? In fact, your evidence is to the contrary, that it happened while he was treating her." The trial court would agree with defendant's counsel that John could be cross-examined about the violation of Business and Professions Code section 729 if there

was evidence he terminated the patient relationship in order to have a sexual relationship with defendant. The trial court was willing to ask John that question outside the presence of the jury.

Defendant's counsel then argued that the jurors should know that having a sexual relationship with a current client was illegal. It was relevant to his credibility. Defendant's counsel understood there was no evidence that John terminated the relationship, but there was evidence defendant was a current patient when the relationship started. Defendant's counsel argued John was denying their sexual relationship occurred during the relationship because he would be legally responsible.

The trial court felt that if the issue were pursued, John would require counsel and that it would delay the trial. The trial court noted, "You already have evidence that— from your perspective, both from your client and her daughter of daughters that he was doing something that was improper, and I think that's sufficient." In addition, the trial court felt that the evidence was cumulative to what was already presented to the jury. John had already admitted that it would be improper if he had sexual relations with defendant while she was still a patient. The trial court refused to allow defendant's counsel to ask John if he was lying about the relationship because it was illegal, or that he was aware that having a relationship with a current client was illegal.

The trial court properly excluded the evidence under Evidence Code section 352. The jury had already been advised that John had an improper relationship with defendant. Defendant testified that he did not want defendant to disclose the information. The issue for the jury to resolve was whether defendant had lawful custody at the time defendant

34

took Minor, and if she did not, whether she took Minor because Minor was in imminent danger of harm from John. The jury was already aware that John's actions violated the APA ethical rules and further information he also violated the AMA ethical rules would not have added anything to the case. The trial court properly determined that such evidence would be cumulative. It was clear John felt that his sexual relationship was appropriate despite any ethical rules. Additional evidence there were AMA ethical rules that John was violating would not have changed how the jury viewed John.

Further, admission of evidence that John may be criminally liable was more prejudicial than probative. There was conflicting evidence as to whether the relationship between John and defendant started while she was still a patient. There was no evidence that he terminated their relationship in order to pursue a relationship with defendant. The admission of testimony that John could potentially be exposed to criminal charges was prejudicial as there was nothing in the evidence to support the charge. Further, it was only marginally relevant to the actual charges in the case, which required the jury decide if defendant had custody of Minor when she took her to Idyllwild and Washington and whether defendant caused Minor harm. Additional evidence attacking John's credibility, who as the prosecutor stated had already been shown to be a "creep," was cumulative and prejudicial.[7] The trial court properly exercised its discretion under Evidence Code section 352.

---

[7] We additionally note that defendant's counsel did not make the request to admit this evidence until rebuttal when the trial was almost complete. This information was

*[footnote continued on next page]*

D.    PROBATION CONDITION

Defendant contends the probation condition that she have no contact with Minor during the five-year probation term[8] should be modified or stricken as it is constitutionally overbroad.

The prosecutor at sentencing requested a prison sentence for defendant.  The trial court felt that five years of formal probation was appropriate.  The trial court imposed an 11 year 8 month suspended sentence and imposed five years of formal probation.  Defendant's counsel and defendant had no objection to the probation conditions which included that she was to, "Have no direct or indirect contact with [John] and [Minor]."[9]  The trial court clarified to defendant that this meant, "no phone calls, no texts, no emails, no Instagram and no third party contact."  Defendant thanked the court for granting probation.

"[A] sentencing court has 'broad discretion to impose conditions to foster rehabilitation and to protect public safety pursuant to Penal Code section 1203.1.' " (*People v. Moran* (2016) 1 Cal.5th 398, 403.)  "If a probation condition serves to rehabilitate and protect public safety, the condition may 'impinge upon a constitutional

_____

readily available when John first testified.  It undoubtedly would have delayed the trial if John had to be afforded counsel.

[8] We note that section 1203.1 was recently amended to limit the maximum term of probation a trial court is authorized to impose for most felony offenses to two years.  Defendant is exempt from the two-year limitation based on her conviction of kidnapping. (§§ 667.5, subd. (c)(14), 1203.1, subd. (g)(3)(A).)

[9] The People do not contend on appeal that defendant waived her claim by failing to object in the trial court.

36

right otherwise enjoyed by the probationer, who is "not entitled to the same degree of constitutional protection as other citizens." ' " (*People v. O'Neil* (2008) 165 Cal.App.4th 1351, 1355.)

"A parent's interest in the companionship, care, custody and management of his children is a compelling one, ranked among the most basic of civil rights." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 306; see also *In re Vincent M.* (2008) 161 Cal.App.4th 943, 965.) However, "the welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect." (*Marilyn H.*, at p. 307.)

A constitutionally overbroad probation condition is one that restricts a defendant's fundamental constitutional rights to a greater degree than necessary to achieve the condition's purpose. (*People v. Olguin* (2008) 45 Cal.4th 375, 384.) " 'The essential question in an overbreadth challenge is the closeness of the fit between the legitimate purpose of the restriction and the burden it imposes on the defendant's constitutional rights—bearing in mind, of course, that perfection in such matters is impossible, and that practical necessity will justify some infringement.' " (*People v. Appleton* (2016) 245 Cal.App.4th 717, 723.) Constitutional challenges to probation conditions are reviewed de novo. (*In re Shaun R.* (2010) 188 Cal.App.4th 1129, 1143.)

Defendant relies on the case of *People v. Jungers* (2005) 127 Cal.App.4th 698 (*Jungers*) to support that the probation condition that she have no contact with Minor was unconstitutionally overbroad. In *Jungers*, the defendant was convicted of corporal injury on a spouse or cohabitant and was granted probation. A term of his probation was he was not to initiate contact with the victim, whom he married after his conviction. However,

the victim could contact the defendant. (*Id.* at pp. 701-702.) On appeal, defendant argued that the condition was unreasonable and violated his constitutional rights to free association and marital privacy. (*Id.* at p. 700.)

The appellate court first found that, "restrictions on a probationer's right of association are permissible if reasonably required to accomplish the needs of the state." (*Jungers*, *supra*, 127 Cal.App.4th at p. 703.) "However, probation conditions that restrict constitutional rights must be carefully tailored and 'reasonably related to the compelling state interest' in reforming and rehabilitating the defendant." (*Id.* at p. 704.) The court found that "elimination of domestic violence is a compelling state interest." (*Ibid.*) It found that despite the court's order curtailing defendant's rights of association and marital privacy, "it legitimately and reasonably operated to accomplish the needs of the state in addressing domestic violence by rehabilitating" defendant and protecting the victim. (*Id.* at p. 705.)

The *Jungers* court also concluded that it was narrowly drawn finding, "The court did not impose a complete ban on association or marital privacy, but only a narrowly tailored condition consistent with Jungers's rehabilitation and the safety of the victim." (*Jungers*, *supra*, 127 Cal.App.4th at p. 704.)

We do not view the holding in *Jungers* to require that in every case a victim should be allowed to contact the defendant in order to survive constitutional scrutiny. The probation condition here certainly protected Minor and helped to serve the rehabilitative goal of defendant respecting the family court orders.

However, in this case, the probation condition should have been more narrowly drawn. Although defendant took Minor away from John on two occasions, the evidence supported that Minor was well cared for while in defendant's care, and that she was bonded to defendant. Deleon, the family court monitor, witnessed a loving relationship between defendant and Minor when monitoring visits in 2018 and 2019, after they returned from Idyllwild. Minor, who was born in July 2013, would be nine years old now, and could reasonably decide if she wanted to have contact with defendant.

The People contend probation was granted on the agreement that defendant would not contact Minor, and that if this court were to consider modifying the condition based on it being overbroad, the matter should be remanded to the trial court for it to consider withdrawing the grant of probation. The People provide no legal authority to support his proposition that the trial court could withdraw its grant of probation. We conclude that such conclusory claim has been waived for failing to provide adequate legal authority. (*People v. Dixon* (2007) 153 Cal.App.4th 985, 996.)

Remand is unnecessary as this condition can easily be modified on appeal. We will order that the probation condition banning any contact between defendant and Minor be modified to provide that "Minor can contact defendant. Defendant shall not initiate contact with Minor unless authorized by the family court. Any visitation between Minor and defendant must be supervised."

E.  MENTAL HEALTH DIVERSION

Defendant contends the trial court should have sua sponte considered mental health diversion pursuant to section 1001.36 at the time of sentencing. She insists the

matter should be remanded and the trial court should consider if she was eligible. Further, if this court finds that she waived the issue due to her counsel failing to raise the issue at sentencing, she received ineffective assistance of counsel.

"Section 1001.36 authorizes a pretrial diversion program for defendants with qualifying mental disorders. The statute defines ' "pretrial diversion' " as 'the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment.' " (*People v. Frahs* (2020) 9 Cal.5th 618, 626.) Section 1001.36 was enacted effective June 27, 2018. (Stats. 2018, c. 34 (A.B. 1810), § eff. June 27, 2018.) Defendant's trial commenced in April 2021, well after section 1001.36 was enacted. Relying on this court's recent case of *People v. Braden* (2021) 63 Cal.App.5th 330, review granted July 14, 2021 (*Braden*),[10] defendant was ineligible for pretrial diversion at sentencing because she did not request mental health diversion before her trial commenced.

In *Braden*, *supra*, 63 Cal.App.5th 330, this court determined that the mental health diversion statute only allows for a request that it apply to be made pretrial. Here, no request was ever made below despite the statute being enacted two years prior to defendant's trial. We follow the reasoning in *Braden*, and see no reason to repeat its

---

[10] This case can be cited here pursuant to California Rules of Court, rule 8.1115, subdivision (e)(3), and pursuant to the California Supreme Court's order granting review. We also note that defendant referred to *Braden* in the opening brief but made no argument that a request for diversion did not need to be made prior to the trial.

principles here. Since defendant did not request diversion before her trial, she was not eligible to be considered for diversion at the time of sentencing.

Defendant contends she received ineffective assistance of counsel for her counsel's failure to request mental health diversion at the time of sentencing. "The standard for showing ineffective assistance of counsel is well settled. 'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. [Citations.] A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel.' " (*People v. Gray* (2005) 37 Cal.4th 168, 206-207 (*Gray*); see also *Strickland v. Washington* (1984) 466 U.S. 668, 687.)

" 'If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. [Citation.] Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus.' " (*Gray*, *supra*, 37 Cal.4th at p. 207.)

As stated, defendant was not entitled to pretrial diversion at the time of sentencing under *Braden*. Further, defendant makes no argument as to why mental health diversion

41

was not requested prior to the commencement of trial. We can surmise counsel may have believed that defendant would be acquitted of the charges based on a belief that she was more credible than John. The claim is better addressed in a habeas corpus petition. (*Gray*, *supra*, 37 Cal.4th at p. 207.)

## DISPOSITION

We direct the trial court to modify defendant's probation condition ordering no contact between defendant and Minor to provide that "Minor can contact defendant. Defendant shall not initiate contact with Minor unless authorized by the family court. Any visitation between Minor and defendant must be supervised." In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
Acting P. J.

We concur:

SLOUGH
J.

RAPHAEL
J.

42